**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| E.B., | : | Case No.: |
| | : | |
| Plaintiff, | : | Judge: |
| | : | |
| vs. | : | Magistrate Judge: |
| | : | |
| Educational Service Center of Lake Erie | : | |
| West, | : | |
| | : | |
| Mike Smurr, Principal of Alternate Learning | : | |
| Center West and Alternate Learning Center | : | |
| East, in his individual capacities, | : | |
| | : | |
| Defendants. | : | |

---

**COMPLAINT FOR DECLARATORY RELIEF
AND MONETARY DAMAGES**

---

**I.      INTRODUCTION**

1.    E.B. is a young man, who has been diagnosed with a range of conditions

including ADHD, Oppositional Defiant Disorder (ODD), Obsessive Compulsive Disorder

(OCD), Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS),

Asperger's, an unspecified disorder of the central nervous system, mild mental retardation,

and finally, as a result of the conduct of the Defendants,  Post-Traumatic Stress Disorder.  As

an individual with significant limitations caused by various educational and mental health

related disabilities, E.B. is particularly vulnerable.  During the school year 2009-2010, E.B.

was emotionally traumatized and physically injured as a result of a policy instituted by

Defendants to have him repeatedly arrested, handcuffed, physically removed from the school,

1

transported in a locked law enforcement vehicle, and booked on criminal juvenile charges, as a method of managing his behavior. During the school years 2010-2012, E.B. was emotionally traumatized, assaulted and physically injured by the repeated use of restraints and isolation, which were implemented by Defendants as a method of punishing his behavior. As a direct result of the actions of the Defendants, E.B. now suffers from Post-Traumatic Stress Disorder manifesting itself in hyper-arousal, re-experiencing the traumatic events, and a fear of police and authority figures, and difficulties in discussing what happened to him.  Further, E.B. has regressed and his behavioral issues have escalated.

2.       Seclusion and restraint are highly dangerous interventions that have led to death, injury, and trauma in children.  In a 2009 study, the Government Accountability Office collected at least twenty stories of children who died in restraint, and other children have died and been injured in seclusion.[1] For more than two decades, evidence of the vast physical and psychological toll caused by restraint and seclusion has accumulated.[2]  The Council for Exceptional Children has described the "wide variety of injuries and deaths [that] have occurred while students are in seclusion environments including suicide, electrocution, and self-injury due to cutting, pounding, and head banging."[3]

3.       In 2008, the physical restraint of 17-year-old Faith Finley resulted in her death from asphyxiation at Parmadale Institute in Ohio. In August 2009, Governor Ted Strickland responded to this tragedy by issuing Executive Order 2009-13S, which banned prone restraint, limited the use of other physical restraints, and established the Ohio Policy Committee on

---

[1] United States Government Accountability Office, Seclusions and Restraints, Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers 5-8 (2009).

[2] See H.R. REP. NO. 111–417, Preventing Harmful Restraints and Seclusions in School Act 14 (2009)

[3] Council for Children with Behavioral Disorders, Position Summary on the Use of Physical Restraint Procedures in School Settings, 34 Behavioral Disorders 223, 224 (2009).

Restraint and Seclusion.  In spite of the Executive Order and limits on the use of restraints, this practice remains highly dangerous. In January of 2014, 15-year-old Kenneth Barkley died by traumatic asphyxiation during a physical restraint used by staff of the group home where he was a resident. Barkley was living at a Berea, Ohio group home operated by Ohio Guidestone when a staff member placed him in a "bear hug" restraint, resulting in his death.

4.      Solitary confinement and other forms of isolation can cause serious psychological, physical, and developmental harm to children. All children need age-appropriate services and programming for their healthy growth and development. Solitary confinement and isolation practices can be even more harmful for children with disabilities and children who have experienced previous traumatic events.

5.      This is a complaint brought for redress of violations of E.B.'s civil rights and for the severe emotional trauma inflicted upon him by the use of physical restraints and repeated and frequent isolation used by the defendants to "control" behavior resulting from his disabilities. The complaint seeks declaratory and monetary relief.

## II.      JURISDICTION AND VENUE

6.      This  action  arises  under  the  Fourth Amendment and the Due  Process Clause of  the  Fourteenth  Amendment  to the United States Constitution.  Jurisdiction is further invoked pursuant to 28 U.S.C. §§ 1331 and 1343 in that it arises under  Title II of the Americans with Disabilities Act (ADA); Section 504 of  the Rehabilitation Act of  1973 as amended, 29 U.S.C. § 794 ("504"); 42 U.S.C. §§ 12101-12213; and, 42 U.S.C. §§ 1983 and 1988. Declaratory relief claims are asserted pursuant to 28 U.S.C. §§ 2201 and 2202.   Supplemental state claims are asserted pursuant to 28 U.S.C. § 1367, state statutes, and state common law. At all times relevant to this action, Defendants acted under color of state law.

7.      Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.8.

III.    **PARTIES**

**Plaintiff**

8.      E.B.'s date of birth is January 19, 1996, and he was at all relevant times, and remains, a resident of Lucas County, Ohio, within the Northern District of Ohio.

9.      E.B. is a "qualified individual with a disability" as defined under the ADA, 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

10.     E.B. is entitled to the protections of Title II of the Americans with Disabilities Act of 1990. Title II prohibits discrimination by any public entity, including any state or local government as defined by 42 U.S.C. §12131.

11.     E.B. has disabilities that substantially limit one or more of his major life activities --such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information--as defined under the ADA, 42 U.S.C. § 12102(2), 28 C.F.R. § 35.104 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(9)(B), (20)(B).

12.     E.B. meets the essential eligibility requirements for the receipt of services and benefits and is therefore a "qualified handicapped person," as that term is defined in regulations implementing Section 504.  28 C.F.R. § 41.32; 45 C.F.R. § 84.3(1); 7 C.F.R. § 15b.3 (n) (4).

13.     E.B. is eligible for special education services pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 et seq.

**Defendants**

14.     Defendant Educational Service Center of Lake Erie West, (ESC) is a regional education service center organized under the laws of the State of Ohio and is authorized to provide services to local school districts, including special education and related services, and as such may be sued in  its  corporate capacity for its acts and those of its agents and employees.

4

15.     Defendant Educational Service Center of Lake Erie West, (ESC) is not a "school district" as defined by the "Individuals with Disabilities Education Act" (IDEA).

16.     Defendant ESC is a public entity, or an agent of a public entity, within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104.

17.     Defendant ESC is a recipient, or an agent of a recipient, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering it subject to Section 504. 29 U.S.C. § 194(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

18.     Defendant ESC, at all relevant times, operated and had supervisory authority over Alternate Learning Center East (ALC East), Alternate Learning Center West (ALC West) and Defendant Mike Smurr.  Further, acting under color of law, ESC is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the ALC East and ALC West.

19.     Defendant Mike Smurr was, at all relevant times, employed by ESC as the Principal of ALC West and ALC East.  In that capacity, acting under color of law, Defendant Smurr  is responsible for oversight of decision and policymaking functions of ALC West and ALC East; has final policy decision making authority, including, but not limited to those involving interventions for students who have behavioral issues; was responsible for the supervision and training of the staff at ALC West and ALC East; and the implementation of and compliance with all official governmental laws, policies, regulations and procedures governing the ALC West and East.  He is sued in his individual capacity.

**IV.    SERVICES AND TREATMENT OF CHILDREN WITH DISABILITIES**

20.    Sylvania Public School District was E.B.'s local educational agency (LEA) and as such was, at all times relevant herein, required to make a determination that E.B. was eligible for services pursuant to the IDEA and to provide E.B. with an Individualized Education Program (IEP). IEP defines the individualized objectives of a child who has been found with a disability, as defined by federal regulations. The IEP is intended to help children reach educational goals more easily than they otherwise would. 34 C.F.R. 300.320.

21.    Although not a school district, as defined by the IDEA, and not E.B.'s local school district responsible for development of E.B.'s Individual Education Plan, Defendants were required to provide services and to manage E.B. behaviors in a manner consistent with recognized educational and behavioral management methods and federal law.

22.    Defendants discriminated against E.B., on the basis of his disability, by not protecting him while at school from harm and injury as evidenced by not providing a safe learning environment and not allowing E.B. to access educational services and programs, as evidenced by the following:

   a.    Defendants failed to timely provide a behaviorist to properly document E.B.'s behaviors and conduct a behavioral assessment that systematically looked at the antecedents of behaviors in order to develop an appropriate plan to address E.B.'s behaviors.

   b.    Defendants failed to implement an appropriate behavior intervention plan. A behavioral intervention plan is a plan that is based on the results of a behavioral assessment and, at a minimum, includes a description of the

6

problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior.

c.      Defendants failed to provide employees, who were trained in the proper methods of restraining a child with disabilities, proper use of isolation and in appropriate behavioral interventions.

d.      Defendants failed to provide E.B. a process to evaluate his behavior prior to consideration for suspension, expulsion or any alternative placement due to behavioral concerns. This process should have been used to determine if the actions that resulted in the consideration of some disciplinary action against the E.B. were manifestations of his disabilities. 20 U.S.C. § 1415

23.    Exhaustion of administrative remedies, as defined by Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 et seq., is not required or even possible because Defendants' are not proper parties for such action and no administrative relief against Defendants is available to Plaintiff E.B. for his injuries.

**V.    FACTS**

**Overview of Educational History**

24.    E.B. is a young man with a disability who has struggled with daily functioning, academics, behaviors, and relationships throughout his life.

25.    E.B. had developmental delays as a young child and did not speak until the age of three.  He was first diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") at age 5.

26.     Over the course of many years, assessments by various mental health and medical providers diagnosed E.B. with a range of conditions including ADHD, Oppositional Defiant Disorder ("ODD"), Obsessive Compulsive Disorder ("OCD"), Pervasive Developmental Disorder-Not Otherwise Specified ("PDD-NOS"), Asperger's, an unspecified disorder of the central nervous system, mild mental retardation, and Post-Traumatic Stress Disorder ("PTSD").

27.     From 2005 – 2007, E.B. attended Summit Academy, a charter school in Toledo, Ohio, serving students with ADHD and students on the autism spectrum.  In 2006, E.B. was identified by Summit Academy as a student eligible for special education services, pursuant to Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 et seq., due to an Emotional Disturbance.

28.     In the fall of 2007, E.B. returned to Toledo Public Schools and was soon thereafter placed in a separate school for children with severe emotional and behavioral issues, the DeVilbiss Achievement Center.

29.     E.B. and his mother moved into the Sylvania Public Schools district in 2009.  At all relevant times E.B's home school district and Local Educational Agency was Sylvania Public School District.

30.     At all relevant times, Sylvania Public Schools was responsible for ensuring compliance with the requirements of the IDEA relevant to placement and services for E.B. and completed all of E.B.'s IEP's from 2009 through 2012.

31.     Pursuant to a contract between Sylvania Public School district and Educational Service Center of Lake Erie West, E.B. began attending the Alternate Learning Center West (ALC West) in September 2009.  ALC West is a separate educational facility operated by ESC.

ALC West operates an educational program for K-12 students with severe learning, behavioral, and mental health needs.

32.     In October 2010, E.B. was transferred to ALC East, another separate facility school operated by the ESC.  E.B. remained at ALC East until March of 2012 when E.B. was suspended.

33.     Upon information and belief, Sylvania Public Schools contracted with the ESC to provide for E.B.'s education during the time that he attended ALC West and ALC East.

34.     In May of 2012, E.B. was placed in the Adriel Group Home in Liberty Center, Ohio.

35.     In May of 2012, E.B. also was re-evaluated by Sylvania Public Schools and identified as a student eligible for special education services under the educational disability category of Autism.

36.     E.B. has exhibited challenging behaviors in school due to his disability including; difficulty focusing on academics and following directions, impulsivity, inability to accept feedback and consequences, cursing, threatening staff and peers with harm, throwing items, and threatening to commit suicide or harm himself.

37.     As a child with significant limitations caused by various educational and mental health related disabilities, E.B. is particularly vulnerable.  This vulnerability heightens Defendants' level of responsibility for E.B.'s well-being.

**School Years 2009-2010**

38.     In September of 2009, E.B. was placed by Sylvania Public School district at ALC West, which is a highly restrictive environment in which children from all over Lucas County who have been designated as having "multiple disabilities" are geographically and educationally

9

segregated from typically-developing peers. The ALC West facility is located within the City of Toledo, Ohio. At the time he was placed there, E.B. was not suffering from emotional trauma associated with being arrested, being handcuffed, being placed into physical custody, being physically restrained, or being physically removed from school by a law enforcement officer.

39. During his enrollment at ALC West, E.B. was subjected to abusive treatment and emotional trauma because of his disabling condition and behaviors associated with his disabilities.

40. In September 2009, Defendant Smurr told Erin B., E.B.'s mother, that he was initiating a practice and custom to manage E.B.'s behaviors by having E.B. arrested when E.B. acted out and would not respond to directions from the staff at ALC West.

41. E.B.'s grandmother, D.G., was present at ALC West early in the school year with E.B.'s mother, when Defendant Smurr stated that Deputy Sheriff Hayden, a Lucas County Deputy Sheriff, would be on duty in the school to change behaviors.

42. Acting at the direction of, and consistent with Defendant Smurr's practice and custom, Deputy Hayden was assigned to work at ALC West each day and would arrest, handcuff and physically remove E.B. from school.

43. Deputy Hayden did not use his independent judgment in deciding whether or not to arrest E.B., but would arrest E.B. at the direction of Defendant Smurr and consistent with Defendant Smurr's practices and customs.

44. Defendant Smurr's practice and custom to manage E.B.'s behaviors by having E.B. arrested when E.B. acted out and would not respond to directions from the staff at ALC West was to initiate charges against E.B. pursuant to Toledo's Safe School Ordinance, among other charges. Toledo's Safe School Ordinance provides "(a) No person shall * * * disrupt,

10

disturb or interfere with the teaching of any class of students, or disrupt, disturb or interfere with any activity conducted in a school * * *. (b) Whoever violates this section is guilty of a misdemeanor of the first degree." Toledo Municipal Code 537.16

45. Defendant Smurr, or other staff members at ALC West at the direction of Defendant Smurr, initiated the practice and custom of having E.B. arrested on the following dates, and for the following offenses, while he was attending school at ALC West:

a. On September 9, 2009, one week after starting school at ALC West, E.B. was arrested, handcuffed in school, and transported to the Lucas County Juvenile Detention Center in the back of a patrol car by a deputy sheriff. E.B. was charged with a Safe School violation.

b. On November 18, 2009, E.B. was arrested a second time while attending ALC West. He was handcuffed in the school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. E.B. was charged with a Safe School violation, menacing, and resisting arrest.

c. On November 25, 2009, E.B. was arrested a third time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

d. On December 2, 2009. E.B. was arrested a fourth time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

e.     On December 10, 2009, E.B. was arrested a fifth time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

f.     On January 26, 2010,  E.B. was arrested a sixth time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation, resisting arrest, and assault.

g.     On March 4, 2010, E.B. was arrested a seventh time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation and menacing.

h.     On March 25, 2010, E.B. was arrested an eighth time while attending ALC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

i.     On September 2, 2010, shortly after returning to school at ALC West, E.B. was arrested a ninth time. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation, resisting arrest and assault.

46.    On September 15, 2010, while discussing E.B.'s arrest on September 2, 2010 for assaulting a staff member at ALC West, Defendant Smurr stated to Angie Weiskittle, a mental

health professional from the Zepf Community Mental Health Center (Zepf), that E.B. did not commit an assault and that what occurred was an accident. Defendant Smurr indicated that he would provide this information to the court.

47. On September 17, 2010, the Juvenile Court adjudicated E.B. delinquent and sentenced him for the assault charge that Defendant Smurr previously admitted was an accident.

48. In September of 2010, Defendant Smurr, while discussing E.B.'s most recent arrest, told Erin B., E.B.'s mother that his policy of having E.B. arrested to manage his behavior did not work.

49. Defendant Smurr's practice and custom of having E.B. repeatedly arrested, and the manner in which the Defendant Smurr had E.B. arrested, was implemented in an attempt to punish E.B. for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors, and failing to appropriately interpret social situations.  These characteristics are manifestations of his disabilities and occurred because of his disabilities.

**School Years 2010-2012**

50. In October 2010, E.B. was transferred from ALC West to ALC East. ALC East is a highly restrictive environment in which children from all over Lucas County who have been designated as having "multiple disabilities" are geographically and educationally segregated from typically-developing peers.  At the time he was placed there, E.B. was not suffering from emotional trauma, or PTSD associated with being physically restrained and/or locked in an isolation closet for extended periods of time.

51. No arrests were made from ALC East during the 2010-2011 school year.

52. There were no law enforcement officers stationed at ALC East.

53.     During his enrollment at ALC East, Defendants subjected E.B. to abusive treatment, emotional trauma and physical injury because of his disabling condition and behaviors associated with his disabilities. The abusive treatment, emotional trauma and physical injuries E.B. suffered while enrolled at ALC East occurred as a result of the following actions of the Defendants' staff or as a result of the policies, practices and customs instituted by the Defendants:

a.     The staff at ALC East used restraint and seclusion to address E.B.'s disability related behaviors.

b.     On numerous occasions E.B. was "escorted" or bodily forced into the "seclusion room."

c.     The isolation, or seclusion room, was approximately 8 feet by 10 feet and had padded walls and floors. The door was metal and had a small window in the upper portion of the door.  The staff would sometimes put E.B. in the room alone with the door closed (especially if he was very upset, crying or calling for help). On other occasions the door would be open with someone sitting on a chair in the door way immediately outside the isolation or seclusion room.

d.     The staff at ALC East used restraint techniques whereby E.B.'s feet were off the ground as he was dragged into an isolation room or to the office. E.B. was "escorted" or forced to move in this manner multiple times throughout the course of a day.  This endangered his safety and well-being and inflicted emotional distress, pain, and physical injuries on E.B.

e.     The staff at ALC East used harmful, non-certified interventions causing emotional distress and physical harm to E.B.

f.     On or about March 21, 2012, E.B. became upset and, consistent with the behaviors associated with his disabilities, began acting out. Instead of appropriately responding and engaging E.B., the staff at ALC East allowed and watched E.B. run out of the school building, climb over a fence, and leave school property. He ran to a parking lot where cars were driving in and out of the school property, endangering his safety.

54.     Defendants' isolation and restraint of E.B. was punitive and not based on any acceptable or appropriate behavior management protocol.

55.     On a number of occasions, E.B. was confined in the isolation room for a set number of hours, regardless his demeanor or whether his was able to return to his classroom. On one such occasion, when E.B.'s mother picked him from the isolation room at ALC East, she was told that he would need to return to the isolation room the next morning to finish his "punishment."

56.     Defendants' use of restraints and isolation resulted in E.B. regressing and his behavioral issues escalating and caused both physical and emotional harm to E.B.

57.     Mental health professionals repeatedly informed Defendants that the use of isolation and restraints were not effective with E.B., and in fact were traumatizing and causing emotional and physical harm.

58.     E.B. remained at ALC East until March 21, 2012, when he was arrested for a violation of the Safe School Ordinance and vandalism.  E.B. was not allowed to return to ALC East after that arrest.

15

59.     The use by ALC East staff of behavioral modification techniques subjected E.B. to long periods of seclusion and restraint resulting in E.B. suffering severe emotional trauma. This trauma was manifested by E.B.'s crying, sobbing, tearing his clothes, rocking back and forth, curling up in the corner in a fetal position and scratching himself, and suffering bruises, and broken blood vessels in his face. Further, E.B. was emotionally traumatized by the use of these behavioral modification techniques.

60.     Defendants' policies in restraining and isolating E.B. were implemented to punish E.B. for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and failing to appropriately interpret social situations.   These behaviors are manifestations of his disabilities and occurred because of his disability.

61.     Defendants  knew or should have known about the practices with respect to Plaintiff E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B., including the proper training and supervision of staff who interacted with E.B.

## VI.    CLAIMS

### FIRST CLAIM
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12131 et seq.
### Against Defendant Educational Service Center of Lake Erie West,

62.      Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

63.     Defendant ESC is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or an agent of such public entities.

64.     Title II of the ADA protects persons from discrimination on the basis of disabilities by public entities. 42 U.S.C. Section 12131, et seq.; 28 C.F.R. Part 35.   Section 12132 states in relevant part that "no qualified individual with disability shall by reason of disability…. be subjected to discrimination by any such entity."

65.     Defendant ESC violated E.B.'s rights under the Americans with Disabilities Act, by discriminating against E.B. on the basis of his disability by:

    a.     engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically  having E.B. repeatedly and frequently arrested , restrained and isolated even after being informed by mental health professionals that these actions by Defendants were causing E.B. emotional trauma, and emotional injury;

    b.     failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as  E.B., in particular having a policy that utilized having E.B. repeatedly handcuffed, arrested, physically removed from school and transported by  a deputy sheriff to the Juvenile Detention Center as a method of managing his behavior;

    c.     using restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm, including inflicting emotional trauma, severe and grievous mental and emotional suffering, humiliation,

shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression, and anxiety.

d.    by repeatedly arresting E.B. and removing him from school and by restraining and isolating E.B. for long periods of time as punishment, Defendant denied E.B. access to programs and services, to which he was entitled by federal and state law, based on his disabilities.

66.    The actions of the Defendant ESC, as described above, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.

67.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

68.    Defendant ESC knew or should have known about the abusive practices with respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B.

## SECOND CLAIM
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. §§794 et seq.
### Against Defendant Educational Service Center of Lake Erie West,

69.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

70.    Defendant ESC is a recipient, or an agent of a recipient, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering them subject

to Section 504. 29 U.S.C. § 194(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

71.     Section 504 of the Rehabilitation Act of 1973, prohibits discrimination against persons with disabilities. 29 U.S.C. § 794; 34 C.F.R. Part 104.  Section 504 states that "no otherwise qualified handicapped individual in the U.S. … shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

72.     Defendant ESC discriminated against Plaintiff E.B. by:

    a.     engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically  having E.B. repeatedly and frequently arrested and repeatedly and frequently restrained and isolated even after being informed by mental health professionals that these actions by defendants were causing E.B. emotional trauma and emotional injury;

    b.     failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as  E.B., in particular having a policy that utilized having E.B. repeatedly handcuffed, arrested, physically removed from school and transported by  a deputy sheriff to the Juvenile Detention Center as a method of  managing his behavior;

    c.     using restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate

and was causing E.B. emotional harm, including inflicting emotional

trauma, severe and grievous mental and emotional suffering, humiliation,

shame, embarrassment, worry, fear, anguish, shock, nervousness,

behavioral regression and anxiety; and

d.       by repeatedly arresting E.B. and removing him from school and by

restraining and isolating E.B. for long periods of time, Defendant denied

E.B. access to programs and services, to which he was entitled by federal

and state law, based on his disabilities.

73.     The actions of the Defendant ESC, as described above, were malicious,

deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard

of the harm that would be inflicted upon E.B.

74.     As a direct and proximate result of the actions described above, E.B. sustained

physical pain and suffering including injuries to his person, severe pain, emotional trauma,

severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry,

fear, anguish, shock, nervousness, behavioral regression and anxiety.

75.     Defendant ESC knew or should have known about the abusive practices with

respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of

E.B.

**THIRD CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT'S**
**CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS**
**(REPEATED ARRESTS**
**AND REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Against Individual Defendant**
**Michael Smurr**

76.     Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

77.     Title 42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

78.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees citizens the right to be free from State imposed violations of bodily integrity.  The Fourteenth Amendment of the U.S. Constitution provides in relevant part that no State shall "deprive any person of life, liberty or property without due process of law …"

79.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution furthermore incorporates the protections of the Bill of Rights in relation to actions taken by state and local governmental employees.

80.     Defendant Smurr's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer, and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center, detained and repeatedly being physically restrained and isolated for long periods of time. These practices and customs were inflicted upon E.B. to punish him for actions such as engaging in behavioral

21

excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics or manifestations of his disability and occurred because of his disability.

81.     Defendant Smurr's egregious intentional actions were  in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B's disability. These actions taken against E.B., while attending ALC West and ALC East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, and in violation of substantive due process.

82.     During his enrollment at ALC East, the practice of placing E.B. into a closet-like room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, reckless, and deliberately indifferent to the health and safety of E.B. This practice clearly and repeatedly violated his constitutional, statutory and common-law rights.

83.     By his actions, or omissions to act as described herein, Defendant was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S. in violation of 42 U.S.C. § 1983

84.     Defendant Smurr's actions, as described herein, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Smurr and deter others from like conduct.

85.     As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety, including fear of police officers and authority figures and reliving traumatic events.

### FOURTH CLAIM
### VIOLATION OF FOURTH AMENDMENT RIGHT
### TO BE FREE OF UNREASONABLE SEIZURE
### (REPEATED ARRESTS
### AND REPEATED USE OF RESTRAINTS AND ISOLATION)
### (42 U.S.C. § 1983)
### Against Individual Defendant
### Michael Smurr

86.     Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

87.     Title 42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

88.     Plaintiff further has a Fourth Amendment right to be free from unreasonable seizures of his person.

89.     Defendant Smurr's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center and detained and repeatedly being physically restrained and isolated for long periods of time. These practices and customs were inflicted upon E.B. to punish him for actions such as: engaging in

behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behavior and E.B. failing to appropriately interpret social situations. These are characteristics or manifestations of his disability and occurred because of his disabilities.

90.    Defendant Smurr's egregious intentional actions were  in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALC West and ALC East, constitutes infliction of severe emotional trauma  and of pain in violation of E.B.'s liberty interest, in violation of his right to be free of unreasonable seizure.

91.    Defendant Smurr's egregious intentional actions were in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included the ongoing use of lengthy seclusion and restraints with E.B. on all or most days that E.B. attended ALC East. These actions taken against E.B., while attending ALC West and ALC East, constitutes infliction of severe emotional trauma  and of pain in violation of E.B.'s liberty interest, and in violation of his right to be free of unreasonable seizure.

92.    During his enrollment at ACL East, the practice of placing E.B. into a closet-like room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, and deliberately indifferent to the health and safety of E.B.

93.    Defendant Smurr's actions resulted in scratching E.B., grabbing and dragging E.B., lifting E.B. off the ground, causing bruises on E.B.'s body, pulling E.B.'s body in several

directions, physically restraining E.B. in unsafe and painful manners, and isolating E.B. in a small room for extended periods of time. These actions taken against E.B., while attending ALC West and East, constitute infliction of pain in violation of his right to be free of unreasonable seizure.

94.     E.B.'s constitutional right to personal physical integrity, as guaranteed by the Fourth Amendment to the Constitution, has been violated by the conduct of Defendant Smurr, as described herein.

95.     By his actions, or omissions to act as described herein, Defendant Smurr was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws.

96.     The actions of the Defendant Smurr, as described above, were malicious, deliberate, intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Smurr and deter others from like conduct.

97.     By his actions, or omissions to act as described herein, Defendant Smurr was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S. such that E.B. may pursue such violations through 42 U.S.C. § 1983.

98.     As a direct and proximate result of the actions described above, Plaintiff sustained actual damages including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

**FIFTH CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT'S**
**CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS**
**(REPEATED ARRESTS**
**AND REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Unconstitutional Policy**
**Against Defendant Educational Service Center of Lake Erie West,**

99.     Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully

rewritten herein

100.     At all material times, Defendant ESC was acting under color of law.

101.     E.B., like all United States citizens, has constitutional rights to personal physical

integrity, as guaranteed by the Fourth Amendment to the United States Constitution and a right

to substantive due process, as guaranteed by the Fourteenth Amendment to the United States

Constitution.

102.     Defendant Smurr, principle of ALC West and ALC East, was assigned

responsibility for final policy making authority in regards to practices and customs to manage

and control the behavior of students at ALC West and ALC East by Defendant Educational

Service Center of Lake Erie West.

103.     During the 2009-2010 school years at ALC West, Defendant Smurr established

practices and customs that E.B.'s behaviors were going to be managed by having him repeatedly

arrested, handcuffed and physically removed from the school by a Lucas County deputy sheriff.

104.     During the 2010-2012 school years at ALC East, Defendant Smurr established a

policy that E.B.'s behaviors were going to be managed by having him repeatedly restrained and

placed in an isolation room for extended periods of time, even after being repeatedly informed by

mental health professionals that the use of restraints and isolation was causing E.B. emotional harm.

105.    Defendant ESC's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer, and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center and detained and repeatedly being physically restrained  and isolated for long periods of time. These practices and customs were inflicted upon E.B. in an attempt to punish him for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics are manifestations of his disabilities and occurred because of his disabilities.

106.    Defendant ESC's egregious intentional actions or in reckless disregard or deliberate indifference to harm inflicted on E.B., as herein described,  also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALC West and ALC East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, as well as in violation of his right to due process of law. This was an abuse of Defendants' official power and shocking to the conscience.

107.    Defendant ESC's egregious intentional actions or in reckless disregard or deliberate indifference to harm inflicted on E.B. by the ongoing use of lengthy seclusion and physical restraints with E.B. occurred on most, if not every, if not every day that he attended ALC East. These actions taken against E.B., while attending ALC West and ALC East,

constitutes infliction of severe emotional trauma and of pain in violation of E.B.'s liberty interest, in violation of his right to due process of law, such that E.B. can pursue these violations through 42 U.S.C. § 1983, and was an abuse of Defendant ESC's official power and shocking to the conscience.

108.  E.B.'s constitutional rights are clearly established.

109.  As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

110.  Defendant ESC knew or should have known about the abusive practices with respect to E.B., yet failed to take action to provide for the safety and well-being of E.B.

## SIXTH CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### As to Defendant Smurr

111.  Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

112.  The actions of Defendant Smurr, as alleged herein, were done with a malicious purpose, in bad faith or, in a wanton or reckless manner

113.  The outrageous acts against a child with a disabling condition included intentional grabbing and dragging of E.B., lifting E.B. off the ground,  engaging in pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in a small room for long periods of time, especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that the isolation was causing severe emotional trauma.

114.    Defendant Smurr acted with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the probability that their actions would cause E.B. severe emotional distress and physical injury

115.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

116.    The intentional actions of Defendant Smurr, as described above, were with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the harm that would be inflicted upon E.B.  As a result of said intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

## SEVENTH CLAIM
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### As to Defendant Smurr

117.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

118.    The actions of the Defendant Smurr, as alleged herein, were done with a malicious purpose, in bad faith, or in a wanton or reckless manner.

119.    The outrageous acts against a child with a disabling condition included intentional grabbing and dragging of E.B., lifting E.B. off the ground, repeatedly and negligently allowing him to elope and run into dangerous and unsupervised spaces, engaging in pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in a small room for long periods of time, especially after being repeatedly told by mental health

professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that the isolation was causing severe emotional trauma.

120.    Defendant Smurr acted with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the probability that their actions would cause E.B. severe emotional distress and physical injury

121.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

**VII**.    **JURY TRIAL DEMANDED**

122.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff E.B. demands a trial by jury on all issues so triable.

**VIII.    PRAYER FOR RELIEF**

A.    Assume jurisdiction over this action and maintain continuing jurisdiction until Defendants' are in full compliance with every order of this Court.

B.    Declare that Defendants' policies, practices, acts and omissions, as set forth above; violate the rights of the Plaintiff under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fourth Amendment of the United States Constitution, the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the United States Constitution.

C.    To take such actions as are proper and necessary to remedy Defendants' violations.

D.      Order such equitable relief as will make Plaintiff whole for Defendants' unlawful conduct.

E.      Grant to the Plaintiff and against all Defendants, jointly and severally, an appropriate amount of compensatory damages, and against the individual Defendants an appropriate amount of punitive damages.

F.      Award Plaintiff reasonable attorney's fees, including litigation expenses, and costs pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 (for claims arising under the ADA); 29 U.S.C. § 794a (for claims arising under the Rehabilitation Act of 1973); and 42 U.S.C. § 1988 (for all other federal statutory claims) against all Defendants jointly and severally.

G.      Grant and award such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/    Robert A. Cole
Robert A. Cole (#0083053)
Mark Heller (#0027027)
Karen Wu (#0077736)
Advocates for Basic Legal Equality, Inc.
Center for Equal Justice
525 Jefferson Avenue, Ste. 300
Toledo, OH 43604
(419) 255-0814
(419) 259-2880 (fax)
rcole@ablelaw.org
mheller@ablelaw.org
kwu@ablelaw.org

*Attorneys for Plaintiff*