**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| E.B., | : | Case No.:  3:14 CV 1230 |
| | : | |
| Plaintiff, | : | Judge Jack Zouhary |
| | : | |
| vs. | : | Magistrate Judge James R. Knepp, II |
| | : | |
| Educational Service Center of Lake Erie West; | : | |
| | : | |
| | : | |
| Mike Smurr, Principal of Alternate Learning and Career Center West and Alternate Learning and Career Center East, in his individual capacities; | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| and, | : | |
| | : | |
| Lutheran Homes Society, Inc., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

---

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**
**AND MONETARY DAMAGES**

---

## I.      INTRODUCTION

1.      E.B. is a young man, who has been diagnosed with a range of conditions including ADHD, Oppositional Defiant Disorder (ODD), Obsessive Compulsive Disorder (OCD), Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS), Asperger's, an unspecified disorder of the central nervous system, mild mental retardation, and finally, as a result of the conduct of the Defendants,  Post-Traumatic Stress Disorder.  As an individual with significant limitations caused by various educational and mental health

1

related disabilities, E.B. is particularly vulnerable.  During the school year 2009-2010, E.B. was emotionally traumatized and physically injured as a result of a policy instituted by Defendants to have him repeatedly arrested, handcuffed, physically removed from the school, transported in a locked law enforcement vehicle, and booked on criminal juvenile charges, as a method of managing his behavior. During the school years 2010-2012, E.B. was emotionally traumatized, assaulted and physically injured by the repeated use of restraints and isolation, which were implemented by Defendants as a method of punishing his behavior. As a direct result of the actions of the Defendants, E.B. now suffers from Post-Traumatic Stress Disorder manifesting itself in hyper-arousal, re-experiencing the traumatic events, and a fear of police and authority figures, and difficulties in discussing what happened to him.  Further, E.B. has regressed and his behavioral issues have escalated.

2.     Seclusion and restraint are highly dangerous interventions that have led to death, injury, and trauma in children.  In a 2009 study, the Government Accountability Office collected at least twenty stories of children who died in restraint, and other children have died and been injured in seclusion.[1]  For more than two decades, evidence of the vast physical and psychological toll caused by restraint and seclusion has accumulated.[2]  The Council for Exceptional Children has described the "wide variety of injuries and deaths [that] have occurred while students are in seclusion environments including suicide, electrocution, and self-injury due to cutting, pounding, and head banging."[3]

---

[1] United States Government Accountability Office, Seclusions and Restraints, Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers 5-8 (2009).

[2] See H.R. REP. NO. 111–417, Preventing Harmful Restraints and Seclusions in School Act 14 (2009)

[3] Council for Children with Behavioral Disorders, Position Summary on the Use of Physical Restraint Procedures in School Settings, 34 Behavioral Disorders 223, 224 (2009).

3.      In 2008, the physical restraint of 17-year-old Faith Finley resulted in her death from asphyxiation at Parmadale Institute in Ohio. In August 2009, Governor Ted Strickland responded to this tragedy by issuing Executive Order 2009-13S, which banned prone restraint, limited the use of other physical restraints, and established the Ohio Policy Committee on Restraint and Seclusion.  In spite of the Executive Order and limits on the use of restraints, this practice remains highly dangerous. In January of 2014, 15-year-old Kenneth Barkley died by traumatic asphyxiation during a physical restraint used by staff of the group home where he was a resident. Barkley was living at a Berea, Ohio group home operated by Ohio Guidestone when a staff member placed him in a "bear hug" restraint, resulting in his death.

4.      Solitary confinement and other forms of isolation can cause serious psychological, physical, and developmental harm to children. All children need age-appropriate services and programming for their healthy growth and development. Solitary confinement and isolation practices can be even more harmful for children with disabilities and children who have experienced previous traumatic events.

5.      This is a complaint brought for redress of violations of E.B.'s civil rights and for the severe emotional trauma inflicted upon him by the use of physical restraints and repeated and frequent isolation used by the defendants to "control" behavior resulting from his disabilities. The complaint seeks declaratory and monetary relief.

## II.      JURISDICTION AND VENUE

6.      This  action  arises  under  the  Fourth Amendment and the Due  Process Clause of  the  Fourteenth  Amendment  to the United States Constitution.  Jurisdiction is further invoked pursuant to 28 U.S.C. §§ 1331 and 1343 in that it arises under Title II of the Americans with Disabilities Act (ADA); Section 504 of  the Rehabilitation Act of  1973 as amended, 29 U.S.C. § 794 ("504"); 42 U.S.C. §§ 12101-12213; and, 42 U.S.C. §§ 1983 and 1988.

3

Declaratory relief claims are asserted pursuant to 28 U.S.C. §§ 2201 and 2202.   Supplemental state claims are asserted pursuant to 28 U.S.C. § 1367, state statutes, and state common law. At all times relevant to this action, Defendants acted under color of state law.

7.      Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.8.

## III.    PARTIES

**Plaintiff**

8.      E.B.'s date of birth is January 19, 1996, and he was at all relevant times, and remains, a resident of Lucas County, Ohio, within the Northern District of Ohio.

9.      E.B. is a "qualified individual with a disability" as defined under the ADA, 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

10.     E.B. is entitled to the protections of Title II of the Americans with Disabilities Act of 1990. Title II prohibits discrimination by any public entity, including any state or local government as defined by 42 U.S.C. §12131.

11.     E.B. has disabilities that substantially limit one or more of his major life activities - such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information - as defined under the ADA, 42 U.S.C. § 12102(2), 28 C.F.R. § 35.104 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(9)(B), (20)(B).

12.     E.B. meets the essential eligibility requirements for the receipt of services and benefits and is therefore a "qualified handicapped person," as that term is defined in regulations implementing Section 504.  28 C.F.R. § 41.32; 45 C.F.R. § 84.3(1); 7 C.F.R. § 15b.3 (n) (4).

13.     E.B. is eligible for special education services pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 et seq.

**Defendants**

14.     Defendant Educational Service Center of Lake Erie West, (ESC) is a regional education service center organized under the laws of the State of Ohio and is authorized  to provide services to local school districts, including special education and related services, and as such may be sued in its corporate capacity for its acts and those of its agents and employees.

15.     Defendant Educational Service Center of Lake Erie West, (ESC) is a "local education agency" as defined by the "Individuals with Disabilities Education Act" (IDEA). 20 U.S.C. §1401(19).

16.     Defendant ESC is a public entity, or an agent of a public entity, within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104.

17.     Defendant ESC is a recipient, an agent of a recipient, or a contractee of a recipient, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering it subject to Section 504 29 U.S.C. § 794(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

18.     Defendant ESC, at all relevant times: operated and had supervisory authority over Alternate Learning and Career Center West (ALCC West);  had supervisory authority over the learning activities at Alternate Learning and Career Center East (ALCC East); and, supervisory authority over Defendant Mike Smurr.  Further, acting under color of law, ESC is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the ALCC East and for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for all educational activities at ALCC West.

19.    Defendant Mike Smurr is sued in his individual capacity.  He was, at all relevant times, and acting under color of law:

a.    employed by ESC as the Principal of ALCC West;

b.    employed by ESC as the Principal of ALCC East;

c.    was responsible for oversight of all decision and policymaking functions of ALCC West;

d.    responsible for oversight of all decision and policymaking functions regarding educational activities of ALCC East;

e.    had final policy decision making authority, including, but not limited to those involving interventions for students who have behavioral issues at ALCC West;

f.    was responsible for the supervision and training of the staff at ALCC West;

g.    was responsible for the supervision and training of the educational staff at ALCC East;

h.    was responsible for the implementation of and compliance with all official governmental laws, policies, regulations and procedures governing the ALCC West; and,

i.     was responsible for the implementation of and compliance with all educational laws, policies, regulations and procedures governing the ALCC East.

20.    Defendant Lutheran Homes Society, Inc., ("LHS") is an incorporated non-profit organization in Ohio.   It provides residential care and supportive services for youth and elderly, including both residential and day treatment programs.

21.     Defendant LHS is not a "school district" as defined by the "Individuals with Disabilities Education Act" (IDEA).

6

22.     Defendant LHS was, at times relevant to this complaint, an agent and/or contractee of a "public entity," within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104.

23.     Defendant LHS, at times relevant to this complaint, was a recipient, an agent of a recipient, or a contractee of a recipient of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering it subject to Section 504. 29 U.S.C. § 794(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

24.     Defendant LHS, at all relevant times, operated and had supervisory authority over behavioral management activities at Alternate Learning Career Center East (ALCC East). Further, acting under color of law, LHS was responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the behavior management activities at ALCC East.

25.     One of LHS's ministries is LHS Family and Youth Services, Inc. ("LHS"). LHSF&Y is a program of LHS and is not a separate corporation or legal entity.   It is organized and conducted for the purpose of providing care for children and adolescents with emotional, mental health and behavioral impairments.

26.     Defendant LHS, by receiving governmental funding and undertaking the governmental function of caring, treating, and educating Plaintiff E.B., is a state actor for the purposes of the federal claims of this First Amended Complaint.

## IV.     SERVICES AND TREATMENT OF CHILDREN WITH DISABILITIES

27.     Sylvania Public School District was E.B.'s local educational agency (LEA) and as such was, at all times relevant herein, required to make a determination that E.B. was eligible for services pursuant to the IDEA and to provide E.B. with an Individualized Education Program

(IEP). IEP defines the individualized objectives of a child who has been found with a disability, as defined by federal regulations. The IEP is intended to help children reach educational goals more easily than they otherwise would. 34 C.F.R. 300.320.

28.      Defendants ESC, LHS, and Smurr were required to provide services and to manage E.B.'s behaviors in a manner consistent with recognized educational and behavioral management methods and federal law.

29.      Defendants discriminated against E.B., on the basis of his disability, by not protecting him while at school from harm and injury as evidenced by not providing a safe learning environment and not allowing E.B. to access educational services and programs, as evidenced by the following:

      a.      Defendants failed to timely provide a behaviorist to properly document E.B.'s behaviors and conduct a behavioral assessment that systematically looked at the antecedents of behaviors in order to develop an appropriate plan to address E.B.'s behaviors.

      b.      Defendants failed to implement an appropriate behavior intervention plan. A behavioral intervention plan is a plan that is based on the results of a behavioral assessment and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior.

      c.      Defendants failed to provide employees, who were trained in the proper methods of restraining a child with disabilities, proper use of isolation, and use of appropriate behavioral interventions.

    d.    Defendants failed to provide E.B. a process to evaluate his behavior prior to consideration for suspension, expulsion or any alternative placement due to behavioral concerns. This process should have been used to determine if the actions that resulted in the consideration of some disciplinary action against the E.B. were manifestations of his disabilities. 20 U.S.C. § 1415.

30.    Exhaustion of administrative remedies, as defined by Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 *et seq*., is not required or even possible because Defendants are not proper parties for such action and no administrative relief against Defendants is available to Plaintiff E.B. for his injuries.

## V.    FACTS

### Overview of Educational History

31.    E.B. is a young man with a disability who has struggled with daily functioning, academics, behaviors, and relationships throughout his life.

32.    E.B. had developmental delays as a young child and did not speak until the age of three.  He was first diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") at age 5.

33.    Over the course of many years, assessments by various mental health and medical providers diagnosed E.B. with a range of conditions including ADHD, Oppositional Defiant Disorder ("ODD"), Obsessive Compulsive Disorder ("OCD"), Pervasive Developmental Disorder-Not Otherwise Specified ("PDD-NOS"), Asperger's, an unspecified disorder of the central nervous system, mild mental retardation, and Post-Traumatic Stress Disorder ("PTSD").

34.    From 2005 – 2007, E.B. attended Summit Academy, a charter school in Toledo, Ohio, serving students with ADHD and students on the autism spectrum.  In 2006, E.B. was

identified by Summit Academy as a student eligible for special education services, pursuant to Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400 et seq., due to an Emotional Disturbance.

35.     In the fall of 2007, E.B. returned to Toledo Public Schools and was soon thereafter placed in a separate school for children with severe emotional and behavioral issues, the DeVilbiss Achievement Center.

36.     E.B. and his mother moved into the Sylvania Public Schools district in 2009.  At all relevant times E.B's home school district and Local Educational Agency was Sylvania Public School District.

37.     At all relevant times, Sylvania Public Schools was responsible for ensuring compliance with the requirements of the IDEA relevant to placement and services for E.B. and completed all of E.B.'s IEP's from 2009 through 2012.

**Overview of Defendants ESC and LHS**

38.     Pursuant to a contract between Sylvania Public School district and ESC, E.B. began attending the Alternate Learning and Career Center West (ALCC West) in September 2009.

39.     ALCC West is a separate educational facility operated by ESC.

40.     ALCC West operates an educational program for K-12 students with severe learning, behavioral, and mental health needs.

41.     In October 2010, E.B. was transferred to ALCC East, a separate facility owned by LHS, but at which the ESC operated an educational program.

42.     LHS, a private party, and ESC, a public entity, entered into a collaborative contract with shared common goals.  These goals include, but are not limited to, ESC providing education services and LHS providing behavior support to special needs students.

43.     The contract between Defendants LHS and ESC provided that LHS was to render professional milieu behavior interventions and programs to enable high need students to participate successfully in ESC's specialized education programs.

44.     Under the contract LHS was to provide the space for the services, equipment and milieu interventions and ESC was to provide teachers and educational supervision for the program.

45.     LHS was to provide for behavioral and cognitive intervention services to students who otherwise would not be able to function within the educational unit.

46.     LHS staff providing the behavioral and cognitive intervention services were under the direct supervision and control of LHS and subject to substitution or removal at the discretion of LHS.

47.     The ESC could, under the contract, request at any time for cause or no cause that LHS remove a LHS staff person from the program and LHS agreed to submit to such a request.

48.     LHS provided for the behavior management needs of all students enrolled at ALCC East.

49.     Teachers from ESC at ALCC East did not engage in physical restraints or seclusion activities.

50.     LHS staff provided behavior management for students at ALCC East.

51.     Behavior management needs at ALCC East to be provided by LHS included the use of Life Space Crisis Intervention Skills, Crisis Prevention Institutes Crisis Intervention Procedures, and the use of Soft Rooms.

52.     Soft rooms were rooms used by LHS staff in which to place students.

53.     LHS staff and clinical staff created behavior plans and positive reinforcement schedules for students at ALCC East.

54.     LHS staff and clinical staff created behavior plans and positive reinforcement schedules for E.B.

55.     If police interventions were necessary due to a behavior crisis at ALCC East, LHS supervisors were to determine the need and in consultation with ESC teachers authorize and or make the call to the police.

56.     LHS made video and audio recordings of areas considered to be high risk by LHS.

57.     Those high risk areas were defined as including Soft Rooms and attached cool down areas, hallways and other common public areas.

58.     ESC and LHS agreed that special equipment and arrangements for video and audio recording could be made to evaluate student needs within a classroom if agreed to by both ESC and LHS.

59.     LHS staff controlled all student arrivals and departures from ALCC East through the bus/car garage.

60.     All students entering ALCC East through either the bus garage or north entrance were subject to metal detector search by LHS staff.

61.     If an ALCC East student was not emotionally stable, was irrational due to a recent restraint, or unsafe to transport for any other reason, LHS staff and mental health staff could detain a student after school until the student was rational and could be transported safely.

62.     LHS staff were to notify parents of detention as soon as it was determined a student would be detained after school.

63.     LHS either owned or leased the ALCC East property.

64.     E.B. remained at ALCC East until March of 2012 when E.B. was suspended.

65.     Sylvania Public Schools contracted with the ESC to provide for E.B.'s education during the time E.B. attended ALCC West and ALCC East.

66.     Under the contract between Sylvania Public Schools and Defendant ESC, Sylvania agreed to pay Defendant ESC the following amounts for E.B.'s education by the Defendant ESC at different facilities:

        a.     $25,919.00 for fiscal year 2009 at ALCC West;

        b.     $26,697.00 for fiscal year 2010 at ALCC West;

        c.     $42,823.00 for fiscal year 2010 at ALCC East;

        d.     $43,251.00 for fiscal year 2011 at ALCC East;

        e.     $43,684.00 for fiscal year 2012 at ALCC East; and,

        f.     $44,121.00 for fiscal year 2013 at ALCC East.

67.     In May of 2012, E.B. was placed in the Adriel Group Home in Liberty Center, Ohio.

68.     In May of 2012, E.B. also was re-evaluated by Sylvania Public Schools and identified as a student eligible for special education services under the educational disability category of Autism.

69.     E.B. has exhibited challenging behaviors in school due to his disability including; difficulty focusing on academics and following directions, impulsivity, inability to accept feedback and consequences, cursing, threatening staff and peers with harm, throwing items, and threatening to commit suicide or harm himself.

70.     As a child with significant limitations caused by various educational and mental health related disabilities, E.B. is particularly vulnerable.  This vulnerability heightens Defendants' level of responsibility for E.B.'s well-being.

**School Years 2009-2010**

71.     In September of 2009, E.B. was placed by Sylvania Public School district at ALCC West, which is a highly restrictive environment in which children from all over Lucas County who have been designated as having "multiple disabilities" are geographically and educationally segregated from typically-developing peers.

72.     The ALCC West facility is located within the City of Toledo, Ohio.  At the time he was placed there, E.B. was not suffering from emotional trauma associated with being arrested, being handcuffed, being placed into physical custody, being physically restrained, or being physically removed from school by a law enforcement officer.

73.     During his enrollment at ALCC West, E.B. was subjected to abusive treatment and emotional trauma because of his disabling condition and behaviors associated with his disabilities.

74.     In September 2009, Defendant Smurr told Erin B., E.B.'s mother, that he was initiating a practice and custom to manage E.B.'s behaviors by having E.B. arrested when E.B. acted out and would not respond to directions from the staff at ALCC West.

75.    E.B.'s grandmother, D.G., was present at ALCC West early in the school year with E.B.'s mother, when Defendant Smurr stated that Deputy Sheriff Hayden, a Lucas County Deputy Sheriff, would be on duty in the school to change behaviors.

76.    Acting at the direction of, and consistent with Defendant Smurr's practice and custom, Deputy Hayden was assigned to work at ALCC West each day and would arrest, handcuff and physically remove E.B. from school.

77.    Deputy Hayden did not use his independent judgment in deciding whether or not to arrest E.B., and each arrest was at the direction of Defendant Smurr.

78.    Defendant Smurr's practice and custom to manage E.B.'s behaviors by having E.B. arrested when E.B. acted out and would not respond to directions from the staff at ALCC West was to initiate charges against E.B. pursuant to Toledo's Safe School Ordinance, among other charges. Toledo's Safe School Ordinance provides "(a) No person shall * * * disrupt, disturb or interfere with the teaching of any class of students, or disrupt, disturb or interfere with any activity conducted in a school * * *. (b) Whoever violates this section is guilty of a misdemeanor of the first degree." Toledo Municipal Code 537.16.

79.    Defendant Smurr, or other staff members at ALCC West at the direction of Defendant Smurr, initiated the practice and custom of having E.B. arrested on the following dates, and for the following offenses, while he was attending school at ALCC West:

a.    On September 9, 2009, one week after starting school at ALCC West, E.B. was arrested, handcuffed in school, and transported to the Lucas County Juvenile Detention Center in the back of a patrol car by a deputy sheriff. E.B. was charged with a Safe School violation.

b.      On November 18, 2009, E.B. was arrested a second time while attending ALCC West. He was handcuffed in the school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. E.B. was charged with a Safe School violation, menacing, and resisting arrest.

c.      On November 25, 2009, E.B. was arrested a third time while attending ALCC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

d.      On December 2, 2009. E.B. was arrested a fourth time while attending ALCC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

e.      On December 10, 2009, E.B. was arrested a fifth time while attending ALCC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

f.      On January 26, 2010,  E.B. was arrested a sixth time while attending ALCC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation, resisting arrest, and assault.

g.      On March 4, 2010, E.B. was arrested a seventh time while attending ALCC West. He was handcuffed in school and transported to the Juvenile

16

Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation and menacing.

h.   On March 25, 2010, E.B. was arrested an eighth time while attending ALCC West. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation.

i.   On September 2, 2010, shortly after returning to school at ALCC West, E.B. was arrested a ninth time. He was handcuffed in school and transported to the Juvenile Detention Center in the back of a patrol car by a deputy sheriff. He was charged with a Safe School violation, resisting arrest and assault.

80.   On September 15, 2010, while discussing E.B.'s arrest on September 2, 2010 for allegedly assaulting Defendant Smurr at ALCC West, Defendant Smurr stated to Angie Weiskittle, a mental health professional from the Zepf Community Mental Health Center (Zepf), that E.B. did not commit an assault and that what occurred was an accident. Defendant Smurr indicated that he would provide this information to the court.

81.   On September 17, 2010, the Juvenile Court adjudicated E.B. delinquent and sentenced him for the assault charge that Defendant Smurr previously admitted was an accident.

82.   In September of 2010, Defendant Smurr, while discussing E.B.'s most recent arrest, told Erin B., E.B.'s mother that his policy of having E.B. arrested to manage his behavior did not work.

83.   Defendant Smurr's practice and custom of having E.B. repeatedly arrested, and the manner in which the Defendant Smurr had E.B. arrested, was implemented in an attempt to

17

punish E.B. for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors, and failing to appropriately interpret social situations.  These characteristics are manifestations of his disabilities and occurred because of his disabilities.

**School Years 2010-2012**

84.    In October 2010, at the direction of Defendant Smurr, E.B. was transferred from ALCC West to ALCC East.

85.    ALCC East is a highly restrictive environment in which children from all over Lucas County who have been designated as having "multiple disabilities" are geographically and educationally segregated from typically-developing peers.

86.    At the time E.B. was placed at ALCC East he was not suffering from emotional trauma or PTSD associated with being physically restrained and/or locked in an isolation room for extended periods of time.

87.    No arrests of E.B. were made from ALCC East during the 2010-2011 school year.

88.    There were no law enforcement officers stationed at ALCC East.

89.    During his enrollment at ALCC East, Defendants subjected E.B.to abusive treatment, emotional trauma, and physical injury because of his disabling condition and behaviors associated with his disabilities.

90.    The abusive treatment, emotional trauma, and physical injuries E.B. suffered while enrolled at ALCC East occurred as a result of the following actions of the  staff or as a result of the policies, practices and customs instituted by Defendants:

       a.    The staff at ALCC East used restraint and seclusion to address E.B.'s disability related behaviors.

b.   On numerous occasions E.B. was "escorted" or bodily forced into the "seclusion room."

c.   The isolation, or seclusion room, was approximately 8 feet by 10 feet and had padded walls and floors. The door was metal and had a small window in the upper portion of the door.  The staff would sometimes put E.B. in the room alone with the door closed (especially if he was very upset, crying or calling for help). On other occasions the door would be open with someone sitting on a chair in the door way immediately outside the isolation or seclusion room.

d.   The staff at ALCC East used restraint techniques whereby E.B.'s feet were off the ground as he was dragged into an isolation room or to the office. E.B. was "escorted" or forced to move in this manner multiple times throughout the course of a day.  This endangered his safety and well-being and inflicted emotional distress, pain, and physical injuries on E.B.

e.   The staff at ALCC East used harmful, non-certified interventions causing emotional distress and physical harm to E.B.

f.   On or about March 21, 2012, E.B. became upset and, consistent with the behaviors associated with his disabilities, began acting out. Instead of appropriately responding and engaging E.B., the staff at ALCC East allowed and watched E.B. run out of the school building, climb over a fence, and leave school property. He ran to a parking lot where cars were driving in and out of the school property, endangering his safety.

91.     Defendants' isolation and restraint of E.B. was punitive and not based on any acceptable or appropriate behavior management protocol.

92.     On a number of occasions, E.B. was confined in the isolation room for a set number of hours, regardless of his demeanor or whether his was able to return to his classroom. On one such occasion, when E.B.'s mother picked him from the isolation room at ALCC East, she was told by Defendants that E.B. would need to return to the isolation room the next morning to finish his "punishment."

93.     Defendants' use of restraints and isolation resulted in E.B. regressing and his behavioral issues escalating and caused both physical and emotional harm to E.B.

94.     Mental health professionals repeatedly informed Defendants that the use of isolation and restraints were not effective with E.B., and in fact were traumatizing and causing emotional and physical harm.

95.     E.B. remained at ALCC East until March 21, 2012, when he was arrested for a violation of the Safe School Ordinance and vandalism.  E.B. was not allowed to return to ALCC East after that arrest.

96.     The use by Defendants' ESC and LHS ALCC East staff of behavioral modification techniques subjected E.B. to long periods of seclusion and restraint resulting in E.B. suffering severe emotional trauma.  This trauma was manifested by E.B.'s crying, sobbing, tearing his clothes, rocking back and forth, curling up in the corner in a fetal position and scratching himself, and suffering bruises, and broken blood vessels in his face. Further, E.B. was emotionally traumatized by the use of these behavioral modification techniques.

97.     Defendants' ESC and LHS's policies in restraining and isolating E.B. were implemented to punish E.B. for actions such as: engaging in behavioral excesses, making vocal

noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and failing to appropriately interpret social situations.   These behaviors are manifestations of his disabilities and occurred because of his disability.

98.    Defendants  knew or should have known about the practices with respect to Plaintiff E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B., including the proper training and supervision of staff who interacted with E.B.

## VI.    CLAIMS

### FIRST CLAIM
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12131 et seq.
### Against Defendant Educational Service Center of Lake Erie West

99.        Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

100.        Defendant ESC is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or an agent of such public entities.

101.    Title II of the ADA protects persons from discrimination on the basis of disabilities by public entities. 42 U.S.C. Section 12132; 28 C.F.R. Part 35.   Section 12132 states in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

102.    Defendant ESC violated E.B.'s rights under the Americans with Disabilities Act, by discriminating against E.B. on the basis of his disability by:

21

a.  engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically having E.B. repeatedly and frequently arrested , restrained and isolated even after being informed by mental health professionals that these actions by Defendants were causing E.B. emotional trauma, and emotional injury;

b.  failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as E.B., in particular having a policy that utilized having E.B. repeatedly handcuffed, arrested, physically removed from school and transported by a deputy sheriff to the Juvenile Detention Center as a method of managing his behavior;

c.  using restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm, including inflicting emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression, and anxiety.

d.  by repeatedly arresting E.B. and removing him from school and by restraining and isolating E.B. for long periods of time as punishment, Defendant denied E.B. access to programs and services, to which he was entitled by federal and state law, based on his disabilities.

103.    The actions of the Defendant ESC, as described above, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.

104.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

105.    Defendant ESC knew or should have known about the abusive practices with respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B.

## SECOND CLAIM
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### 29 U.S.C. §§794 et seq.
### Against Defendant Educational Service Center of Lake Erie West

106.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

107.    Defendant ESC is a recipient, or an agent of a recipient, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering them subject to Section 504. 29 U.S.C. § 194(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

108.    Section 504 of the Rehabilitation Act of 1973, prohibits discrimination against persons with disabilities. 29 U.S.C. § 794; 34 C.F.R. Part 104.  Section 504 states that "no otherwise qualified handicapped individual in the U.S. … shall, solely by reason of his handicap,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

109.    Defendant ESC discriminated against Plaintiff E.B. by:

a.    engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically  having E.B. repeatedly and frequently arrested and repeatedly and frequently restrained and isolated even after being informed by mental health professionals that these actions by defendants were causing E.B. emotional trauma and emotional injury;

b.    failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as  E.B., in particular having a policy that utilized having E.B. repeatedly handcuffed, arrested, physically removed from school and transported by  a deputy sheriff to the Juvenile Detention Center as a method of  managing his behavior;

c.    using  or failing to stop the use of restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm, including inflicting emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety; and,

      d.     by repeatedly arresting E.B. and removing him from school and by restraining and isolating E.B. for long periods of time, Defendant denied E.B. access to programs and services, to which he was entitled by federal and state law, based on his disabilities.

110.    The actions of the Defendant ESC, as described above, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.

111.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

112.    Defendant ESC knew or should have known about the abusive practices with respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B.

**THIRD CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT'S**
**CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS**
**(REPEATED ARRESTS**
**AND REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Against Individual Defendant Michael Smurr**

113.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

114.    Title 42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

115.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees citizens the right to be free from State imposed violations of bodily integrity.  The Fourteenth Amendment of the U.S. Constitution provides in relevant part that no State shall "deprive any person of life, liberty or property without due process of law …"

116.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution furthermore incorporates the protections of the Bill of Rights in relation to actions taken by state and local governmental employees.

117.    Defendant Smurr's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer, and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center, detained and repeatedly being physically restrained and isolated for long periods of time. These practices and customs were inflicted upon E.B. to punish him for actions such as engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics or manifestations of his disability and occurred because of his disability.

118.    Defendant Smurr's egregious intentional actions were  in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B's disability. These actions taken against E.B., while attending ALCC West and ALCC

East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, and in violation of substantive due process.

119.    During his enrollment at ALCC East, the practice of placing E.B. into a closet-like room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, reckless, and deliberately indifferent to the health and safety of E.B. This practice clearly and repeatedly violated his constitutional, statutory and common-law rights.

120.    By his actions, or omissions to act as described herein, Defendant was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S. in violation of 42 U.S.C. § 1983

121.    Defendant Smurr's actions, as described herein, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Smurr and deter others from like conduct.

122.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety, including fear of police officers and authority figures and reliving traumatic events.

27

**FOURTH CLAIM**
**VIOLATION OF FOURTH AMENDMENT RIGHT**
**TO BE FREE OF UNREASONABLE SEIZURE**
**(REPEATED ARRESTS**
**AND REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Against Individual Defendant Michael Smurr**

123.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

124.    42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

125.    Plaintiff further has a Fourth Amendment right to be free from unreasonable seizures of his person.

126.    Defendant Smurr's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center and detained and repeatedly being physically restrained and isolated for long periods of time. These practices and customs were inflicted upon E.B. to punish him for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behavior and E.B. failing to appropriately interpret social situations. These are characteristics or manifestations of his disability and occurred because of his disabilities.

127.    Defendant Smurr's egregious intentional actions were  in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included:

28

scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALCC West and ALCC East, constitutes infliction of severe emotional trauma  and of pain in violation of E.B.'s liberty interest, in violation of his right to be free of unreasonable seizure.

128.    Defendant Smurr's egregious intentional actions were in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included the ongoing use of lengthy seclusion and restraints with E.B. on all or most days that E.B. attended ALCC East. These actions taken against E.B., while attending ALCC West and ALCC East, constitutes infliction of severe emotional trauma  and of pain in violation of E.B.'s liberty interest, and in violation of his right to be free of unreasonable seizure.

129.    During his enrollment at ACL East, the practice of placing E.B. into a closet-like room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, and deliberately indifferent to the health and safety of E.B.

130.    Defendant Smurr's actions resulted in scratching E.B., grabbing and dragging E.B., lifting E.B. off the ground, causing bruises on E.B.'s body, pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating E.B. in a small room for extended periods of time. These actions taken against E.B., while attending ALCC West and East, constitute infliction of pain in violation of his right to be free of unreasonable seizure.

131.    E.B.'s constitutional right to personal physical integrity, as guaranteed by the Fourth Amendment to the Constitution, has been violated by the conduct of Defendant Smurr, as described herein.

132.    By his actions, or omissions to act as described herein, Defendant Smurr was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws.

133.    The actions of the Defendant Smurr, as described above, were malicious, deliberate, intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Smurr and deter others from like conduct.

134.    By his actions, or omissions to act as described herein, Defendant Smurr was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S. such that E.B. may pursue such violations through 42 U.S.C. § 1983.

135.    As a direct and proximate result of the actions described above, Plaintiff sustained actual damages including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

**FIFTH CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT'S**
**CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS**
**(REPEATED ARRESTS**
**AND REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Unconstitutional Policy**
**Against Defendant Educational Service Center of Lake Erie West**

136.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

137.    At all material times, Defendant ESC was acting under color of law.

138.    E.B., like all United States citizens, has constitutional rights to personal physical integrity, as guaranteed by the Fourth Amendment to the United States Constitution and a right to substantive due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

139.    Defendant Smurr, principle of ALCC West and ALCC East, was assigned responsibility for final policy making authority in regards to practices and customs to manage and control the behavior of students at ALCC West and ALCC East by Defendant Educational Service Center of Lake Erie West.

140.    During the 2009-2010 school years at ALCC West, Defendant Smurr established practices and customs that E.B.'s behaviors were going to be managed by having him repeatedly arrested, handcuffed and physically removed from the school by a Lucas County deputy sheriff.

141.    During the 2010-2012 school years at ALCC East, Defendant Smurr established a policy or failed to stop a policy that E.B.'s behaviors were going to be managed by having him repeatedly restrained and placed in an isolation room for extended periods of time, even after being repeatedly informed by mental health professionals that the use of restraints and isolation was causing E.B. emotional harm.

31

142.    Defendant ESC's practices and customs of having E.B. repeatedly arrested, handcuffed and physically removed from the school by a law enforcement officer, and being transported by the Lucas County Sheriff's Department to the Juvenile Detention Center and detained and repeatedly being physically restrained  and isolated for long periods of time. These practices and customs were inflicted upon E.B. in an attempt to punish him for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics are manifestations of his disabilities and occurred because of his disabilities.

143.    Defendant ESC's egregious intentional actions or in reckless disregard or deliberate indifference to harm inflicted on E.B., as herein described,  also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALCC West and ALCC East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, as well as in violation of his right to due process of law. This was an abuse of Defendants' official power and shocking to the conscience.

144.    Defendant ESC's egregious intentional actions or in reckless disregard or deliberate indifference to harm inflicted on E.B. by the ongoing use of lengthy seclusion and physical restraints with E.B. occurred on most, if not every, if not every day that he attended ALCC East. These actions taken against E.B., while attending ALCC West and ALCC East, constitutes infliction of severe emotional trauma and of pain in violation of E.B.'s liberty interest, in violation of his right to due process of law, such that E.B. can pursue these violations

through 42 U.S.C. § 1983, and was an abuse of Defendant ESC's official power and shocking to the conscience.

145.    E.B.'s constitutional rights are clearly established.

146.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

147.    Defendant ESC knew or should have known about the abusive practices with respect to E.B., yet failed to take action to provide for the safety and well-being of E.B.

**SIXTH CLAIM**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. §§ 12131 et seq.**
**Against Defendant Lutheran Homes Society, Inc.**

148.     Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

149.    Defendant LHS was an agent of a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1) (A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or an agent of such public entities, at all times relevant here.

150.    Title II of the ADA protects persons from discrimination on the basis of disabilities by public entities. 42 U.S.C. § 12131, *et seq*.; 28 C.F.R. Part 35.   Section 12132 states in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

151.     Defendant LHS violated E.B.'s rights under the Americans with Disabilities Act, by discriminating against E.B. on the basis of his disability by:

    a.     engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically  repeatedly and frequently arrested , restraining and isolating E.B. even after being informed by mental health professionals that these actions by them were causing E.B. emotional trauma, and emotional injury;

    b.     failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as  E.B., in particular having a policy that utilized having E.B. repeatedly restrained and secluded; and,

    c.     using restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm, including inflicting emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression, and anxiety.

152.     The actions of the Defendant LHS, as described above, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.

153.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

154.    Defendant LHS knew or should have known about the abusive practices with respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B.

**SEVENTH CLAIM**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**29 U.S.C. §§794 *et seq*.**
**Against Defendant Lutheran Homes Society, Inc.**

155.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

156.    Defendant Lutheran Homes Society, Inc. was a recipient, or an agent of a recipient, of "federal financial assistance," as defined by Section 504 of the Rehabilitation Act thereby rendering them subject to Section 504. 29 U.S.C. § 794(b) (1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 1 C.F.R. § 15b.3 (f), (g).

157.    Section 504 of the Rehabilitation Act of 1973, prohibits discrimination against persons with disabilities.  29 U.S.C. § 794; 34 C.F.R. Part 104.  Section 504 states that "no otherwise qualified handicapped individual in the U.S. … shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

158.    Defendant Lutheran Homes Society, Inc. discriminated against Plaintiff E.B. by:

a.      engaging in a system and manner of discipline and behavioral management that was inappropriate for a child with disabilities such as Plaintiff E.B.'s, specifically  having E.B. repeatedly and frequently restrained and isolated even after being informed by mental health professionals that these actions by defendants were causing E.B. emotional trauma and emotional injury;

b.      failing to adequately train and supervise its employees and agents to recognize and accommodate individuals with disabilities, such as  E.B., in particular having a policy that utilized having E.B. repeatedly restrained and isolated; and,

c.      using  or failing to stop the use of restraints and isolation in reckless disregard or with deliberate indifference to the harm inflicted on Plaintiff E.B., especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm, including inflicting emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety; and

159.    The actions of the Defendant Lutheran Homes Society, Inc. as described above, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.

160.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma,

severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

161.    Defendant Lutheran Homes Society, Inc. knew or should have known about the abusive practices with respect to E.B., yet failed to take affirmative actions to provide for the safety and well-being of E.B.

**EIGHTH CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT'S CONSTITUTIONAL RIGHT**
**TO SUBSTANTIVE DUE PROCESS**
**(REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Against Defendant Lutheran Homes Society, Inc.**

162.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

163.    42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

164.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees citizens the right to be free from State imposed violations of bodily integrity.  The Fourteenth Amendment of the U.S. Constitution provides in relevant part that no State shall "deprive any person of life, liberty or property without due process of law …"

165.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution furthermore incorporates the protections of the Bill of Rights in relation to actions taken by state and local governmental employees.

166.     Defendant Lutheran Homes Society, Inc. had practices and customs of having E.B. repeatedly being physically restrained and isolated for long periods of time. These practices and customs were inflicted upon E.B. to punish him for actions such as engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics or manifestations of his disability and occurred because of his disability.

167.     Defendant Lutheran Homes Society, Inc.'s egregious intentional actions were in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B's disability. These actions taken against E.B., while attending ALCC East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, and in violation of substantive due process.

168.     During his enrollment at ALCC East, the practice of placing E.B. into a room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, reckless, and deliberately indifferent to the health and safety of E.B. This practice clearly and repeatedly violated his constitutional, statutory and common-law rights.

169.     By its actions, or omissions to act as described herein, Defendant LHS was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S.

170.     Defendant Lutheran Homes Society, Inc.'s actions, as described herein, were malicious, deliberate, and intentional and embarked upon with the knowledge of, or in conscious

disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Lutheran Homes Society, Inc. and deter others from like conduct.

171.    As a direct and proximate result of the actions described above, E.B. sustained physical pain and suffering including injuries to his person, severe pain, emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety, including fear of police officers and authority figures and reliving traumatic events.

**NINTH CLAIM**
**VIOLATION OF FOURTH AMENDMENT RIGHT**
**TO BE FREE OF UNREASONABLE SEIZURE**
**(REPEATED USE OF RESTRAINTS AND ISOLATION)**
**(42 U.S.C. § 1983)**
**Against Defendant Lutheran Homes Society, Inc.**

172.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

173.    42 U.S.C. §1983 provides in part: Every person who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

174.    Plaintiff further has a Fourth Amendment right to be free from unreasonable seizures of his person.

175.    Defendant Lutheran Homes Society, Inc. had practices and customs of having E.B. repeatedly physically restrained and isolated for long periods of time. These practices and

customs were inflicted upon E.B. to punish him for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behavior and E.B. failing to appropriately interpret social situations. These are characteristics or manifestations of his disability and occurred because of his disabilities.

176.     Defendant Lutheran Homes Society, Inc.'s egregious intentional actions were in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B.in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALCC East, constitutes infliction of severe emotional trauma and of pain in violation of E.B.'s liberty interest, in violation of his right to be free of unreasonable seizure.

177.     Defendant Lutheran Homes Society, Inc.'s egregious intentional actions were in reckless disregard, or deliberately indifferent to harm inflicted on E.B., as described herein, and also included the ongoing use of lengthy seclusion and restraints with E.B. on all or most days that E.B. attended ALCC East. These actions taken against E.B., while attending ALCC East, constitutes infliction of severe emotional trauma and of pain in violation of E.B.'s liberty interest, and in violation of his right to be free of unreasonable seizure.

178.     During his enrollment at ALCC East, the practice of placing E.B. into a room for long periods of time as punishment to "break" him was severe and unrelated to any acceptable educational goal, or behavior management plan. It was punitive, malicious, intentional, and deliberately indifferent to the health and safety of E.B.

179.     Defendant Lutheran Homes Society, Inc.'s actions resulted in scratching E.B., grabbing and dragging E.B., lifting E.B. off the ground, causing bruises on E.B.'s body, pulling

E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating E.B. in a small room for extended periods of time. These actions taken against E.B., while attending ALCC East, constitute infliction of pain in violation of his right to be free of unreasonable seizure.

180.    E.B.'s constitutional right to personal physical integrity, as guaranteed by the Fourth Amendment to the Constitution, has been violated by the conduct of Defendant Lutheran Homes Society, Inc. as described herein.

181.    By its actions, or omissions to act as described herein, Defendant Lutheran Homes Society, Inc. was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws.

182.    The actions of the Defendant Lutheran Homes Society, Inc. as described above, were malicious, deliberate, intentional and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon E.B.  As a result of said conduct E.B. is entitled to punitive damages in an amount sufficient to punish Defendant Lutheran Homes Society, Inc. and deter others from like conduct.

183.    By its actions, or omissions to act as described herein, Defendant Lutheran Homes Society, Inc. was acting under color of statute, ordinance, regulation, custom, or usage and subjected E.B. to deprivation of rights, privileges, or immunities secured by the Constitution and laws of the U.S. such that E.B. may pursue such violations through 42 U.S.C. § 1983.

184.    As a direct and proximate result of the actions described above, Plaintiff sustained actual damages including injuries to his person, severe pain, emotional trauma, severe and

grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

## TENTH CLAIM
### VIOLATION OF FOURTEENTH AMENDMENT'S
### CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS
### (REPEATED USE OF RESTRAINTS AND ISOLATION)
### (42 U.S.C. § 1983)
### Unconstitutional Policy
### Against Defendant Lutheran Homes Society, Inc.

185.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein

186.    At all material times, Defendant Lutheran Homes Society, Inc. was acting under color of law.

187.    E.B., like all United States citizens, has constitutional rights to personal physical integrity, as guaranteed by the Fourth Amendment to the United States Constitution and a right to substantive due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

188.    Defendant Lutheran Homes Society, Inc. was assigned responsibility for final policy making authority in regards to practices and customs to manage and control the behavior of students at ALCC East by its contract with Defendant ESC.

189.    During the 2010-2012 school years at ALCC East, Defendant Lutheran Homes Society, Inc. established a policy or failed to stop a policy that E.B.'s behaviors were going to be managed by having him repeatedly restrained and placed in an isolation room for extended periods of time, even after being repeatedly informed by mental health professionals that the use of restraints and isolation was causing E.B. emotional harm.

190.    Defendant Lutheran Homes Society, Inc. adopted practices and customs of having E.B. repeatedly being physically restrained  and isolated for long periods of time. These practices and customs were inflicted upon E.B. in an attempt to punish him for actions such as: engaging in behavioral excesses, making vocal noises, being distractible, showing anxiety, refusing to comply, engaging in refusal behaviors and E.B. failing to appropriately interpret social situations.   These are characteristics are manifestations of his disabilities and occurred because of his disabilities.

191.    Defendant Lutheran Homes Society, Inc.'s egregious intentional actions or actions in reckless disregard or deliberate indifference to harm inflicted on E.B., as herein described, also included: scratching E.B., grabbing and dragging E.B. causing bruising, lifting E.B. off the ground, pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, all due to E.B.'s disability. These actions taken against E.B., while attending ALCC East, constitute infliction of severe emotional trauma and pain in violation of E.B.'s liberty interest, as well as in violation of his right to due process of law. This was an abuse of Defendant Lutheran Homes Society, Inc.'s official power and shocking to the conscience.

192.    Defendant Lutheran Homes Society, Inc.'s egregious intentional actions or in reckless disregard or deliberate indifference to harm inflicted on E.B. by the ongoing use of lengthy seclusion and physical restraints with E.B. occurred on most, if not every, if not every day that he attended ALCC East. These actions taken against E.B., while attending ALCC East, constitutes infliction of severe emotional trauma and of pain in violation of E.B.'s liberty interest, in violation of his right to due process of law, such that E.B. can pursue these violations through 42 U.S.C. § 1983, and was an abuse of Defendant Lutheran Homes Society, Inc.'s official power and shocking to the conscience.

193.     E.B.'s constitutional rights are clearly established.

194.     As a direct and proximate result of the actions described above, E.B. sustained

physical pain and suffering including injuries to his person, severe pain, emotional trauma,

severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry,

fear, anguish, shock, nervousness, behavioral regression and anxiety.

195.     Defendant Lutheran Homes Society, Inc. knew or should have known about the

abusive practices with respect to E.B., yet failed to take action to provide for the safety and well-

being of E.B.

**ELEVENTH CLAIM**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**As to Defendant Smurr**

196.     Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully

rewritten herein.

197.     The actions of Defendant Smurr, as alleged herein, were done with a malicious

purpose, in bad faith or, in a wanton or reckless manner

198.     The outrageous acts against a child with a disabling condition included intentional

grabbing and dragging of E.B., lifting E.B. off the ground,  engaging in pulling E.B.'s body in

several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in

a small room for long periods of time, especially after being repeatedly told by mental health

professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that

the isolation was causing severe emotional trauma.

199.     Defendant Smurr acted with a malicious purpose, in bad faith, or in a wanton or

reckless manner in regard to the probability that their actions would cause E.B. severe emotional

distress and physical injury

200.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

201.    The intentional actions of Defendant Smurr, as described above, were with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the harm that would be inflicted upon E.B.  As a result of said intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

**TWELFTH CLAIM**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**As to Defendant Smurr**

202.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

203.    The actions of the Defendant Smurr, as alleged herein, were done with a malicious purpose, in bad faith, or in a wanton or reckless manner.

204.    The outrageous acts against a child with a disabling condition included intentional grabbing and dragging of E.B., lifting E.B. off the ground, repeatedly and negligently allowing him to elope and run into dangerous and unsupervised spaces, engaging in pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in a small room for long periods of time, especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that the isolation was causing severe emotional trauma.

205.    Defendant Smurr acted with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the probability that their actions would cause E.B. severe emotional distress and physical injury

206.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

## THIRTEENTH CLAIM
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### As to Defendant LHS

207.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

208.    The actions of the Defendant LHS, as alleged herein, were done with a malicious purpose, in bad faith, or in a wanton or reckless manner.

209.    The outrageous acts against a child with a disabling condition included intentional grabbing and dragging of E.B., lifting E.B. off the ground, repeatedly and negligently allowing him to elope and run into dangerous and unsupervised spaces, engaging in pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in a small room for long periods of time, especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that the isolation was causing severe emotional trauma.

210.    Defendant LHS acted with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the probability that their actions would cause E.B. severe emotional distress and physical injury

211.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

**FOURTEENTH CLAIM**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**As to Defendant LHS**

212.    Plaintiff re-alleges and incorporates all of the foregoing allegations as if fully rewritten herein.

213.    The actions of Defendant LHS, as alleged herein, were done with a malicious purpose, in bad faith or, in a wanton or reckless manner

214.    The outrageous acts against a child with a disabling condition included intentional grabbing and dragging of E.B., lifting E.B. off the ground,  engaging in pulling E.B.'s body in several directions, physically restraining E.B. in unsafe and painful manners, and isolating him in a small room for long periods of time, especially after being repeatedly told by mental health professionals that this was inappropriate and was causing E.B. emotional harm and  knowing that the isolation was causing severe emotional trauma.

215.    Defendant LHS acted with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the probability that their actions would cause E.B. severe emotional distress and physical injury

216.    As a direct and proximate cause of the actions described above, E.B. sustained actual damages including injuries to his person, severe pain, tics and emotional trauma, severe and grievous mental and emotional suffering, humiliation, shame, embarrassment, worry, fear, anguish, shock, nervousness, behavioral regression and anxiety.

217.    The intentional actions of Defendant LHS, as described above, were with a malicious purpose, in bad faith, or in a wanton or reckless manner in regard to the harm that would be inflicted upon E.B.  As a result of said intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendant and deter others from like conduct.

### FIFTEENTH CLAIM
### ASSAULT
### As to Defendant LHS

218.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

219.    LHS intentionally and nonconsensually treated the Plaintiff E.B. in a manner with the intent to cause injury or the intent to create fear of apprehension in the Plaintiff.

220.    The conduct of Defendant LHS was unreasonable in relation to any legitimate educational or behavioral management objective.

221.    The actions of LHS constitute the tort of assault under the laws of  Ohio.

### SIXTEENTH CLAIM FOR RELIEF
### False Imprisonment
### As to Defendant LHS

222.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

223.    Defendant LHS did not have any justification for confining the Plaintiff.

224.    The conduct used by LHS to keep Plaintiff E.B. confined was unreasonable in relation to any legitimate educational or behavioral management objective.

225.    The actions of LHS constitute the tort of false imprisonment under the laws of Ohio.

**VII**.   **JURY TRIAL DEMANDED**

226.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff E.B. demands a trial by jury on all issues so triable.

**VIII**.   **PRAYER FOR RELIEF**

A.   Assume jurisdiction over this action and maintain continuing jurisdiction until Defendants' are in full compliance with every order of this Court.

B.   Declare that Defendants' policies, practices, acts and omissions, as set forth above, violate the rights of the Plaintiff under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fourth Amendment of the United States Constitution, the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and state of Ohio tort laws.

C.   To take such actions as are proper and necessary to remedy Defendants' violations.

D.   Order such equitable relief as will make Plaintiff whole for Defendants' unlawful conduct.

E.   Grant to the Plaintiff and against all Defendants, jointly and severally, an appropriate amount of compensatory damages, and against the individual Defendants an appropriate amount of punitive damages.

F.   Award Plaintiff reasonable attorney's fees, including litigation expenses, and costs pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 (for claims arising under the ADA); 29 U.S.C. § 794a (for claims arising under the Rehabilitation Act of 1973); and 42 U.S.C. § 1988 (for all other federal statutory claims) against all Defendants jointly and severally.

G.   Grant and award such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/   Robert A. Cole
Robert A. Cole (#0083053)
Mark Heller (#0027027)
Karen Wu (#0077736)
Advocates for Basic Legal Equality, Inc.
Center for Equal Justice
525 Jefferson Avenue, Ste. 300
Toledo, OH 43604
(419) 255-0814
(419) 259-2880 (fax)
rcole@ablelaw.org
mheller@ablelaw.org
kwu@ablelaw.org


*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2014, a copy of the foregoing Plaintfiff's First Amended Complaint was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. The new Defendant will be asked to sign a Waiver of Service or Served pursuant to the Fed.R.Civ.P.  Parties may access this filing through the Court's system.

/s/ Robert A. Cole (#0083053)
Robert A. Cole
Advocates for Basic Legal Equality, Inc.
525 Jefferson Ave., Suite 300
Toledo, OH  43604
419.255.0814  (phone)
419.259.2880  (fax)
rcole@ablelaw.org